Thank you, Your Honors, and good morning. My name is David Goldsmith, and together with my partner, Carol Villegas, we represent the Plaintiff Pension Fund and the class in this Securities Class Action appeal. This case comes to Your Honors on de novo review from the dismissal of our Securities Class Action complaint on grounds of failure to plead a false or misleading statement. Falsity is the overarching issue before this Court. Sienter, as an element of the claims and loss causation, are not at issue today. Our theory of fraud, Your Honor, can be viewed in some ways as two sides of a coin. Nimble Storage, Inc. is a data storage company. They have one product to build these components that store a lot of information, and they had a commercial business segment that sought to sign up customers which were smaller or mid-sized companies. They wanted to break into what they called and what we call the enterprise business segment, which basically means to try to sign up the largest 5,000 or 5,000 largest companies in the world, which they called the G5,000 or the global 5,000. That was a internal resource of sales and marketing and so on from their commercial side over to this nascent enterprise side. Without disclosing that fact, yes, Your Honor. So, counsel, just to cut to the chase. Sure. What were the false and misleading statements? So the false and misleading statements, Your Honor, essentially were mostly qualitative statements of the growth that they stated that they were enjoying during the class period. They had statements of the nature of bookings growing by 100 percent during a given quarter, or record growth. This was a growth company. They had no profits, but they claimed to be enjoying exponential or record growth during the class period, which was about a year. So one of the issues in the case was that they were misleading statements. Well, just follow me up on the same question. Yeah. What specifically was the false statement that you were relying on? There are a number of statements. Well, give us the strongest one. Sure. So one of the statements that we allege was false is, say, you know, we added more G5,000 customers than any previous quarter, saw the highest ever contribution to bookings compared to any previous quarter. Another statement, this is in May of 2015, is OK. And why is that false? One of the reasons why it's false is that they gave a false impression of the growth that they were enjoying because the false impression was because they were reclassifying. But, I mean, if they said they added more G5,000 customers, is that true or false, that statement? It was false, Your Honor. Because? The reason it was false is because, starting in December of 2014, they were reclassifying their commercial customers as enterprise customers, as G5,000 customers, because they were failing to sign up these G5,000 customers. But did they specifically identify them as commercial versus enterprise? They did at one point. So in the beginning of the time — But you're not relying on that one. No. We're not relying on that one. But at one point — Then I'm having trouble because why can't they combine or talk about a totality of all customers? Why is it up to them specifically to carve out commercial versus enterprise? They don't have to carve out commercial versus enterprise. But when your entire thesis as a growth company is based on your trying to break into the G5,000 and you say, we're signing up more G5,000 customers than ever before, and you're not doing that, and, in fact, what you're doing is you're fussing around with who you treat as — who you consider to be a G5,000 customer and who you consider to be a commercial customer, and you are creating a false impression to the market. I mean, one of the allegations we have, Your Honor, which was provided to us by two of our confidential witnesses, is that we have — we identify in our complaints seven customer accounts, including the Jeffries Investment Bank, the New York Presbyterian Hospital, and Airbnb and others, which were reclassified as enterprise customers, but which never appeared on the G5,000 database or in their internal — I think it does matter.  Well, first of all, we do have one number which they did report during the class period where they say they added 41 G5,000 customers during the quarter. That was in February of 2015. They do disclose that number, and we allege that that was false. So that number, we allege, was false because — Where was that number reported? What's the basis for the misleading statement, we added more G5,000 customers than in any other quarter? Was that in a quarterly report? Was it in a stockholder meeting? Where was that statement made? It was made in a shareholder letter. So every quarter, they issued an 8K current report that attached what they called a shareholder letter, where they provided various information and updates to the market. And that is where most of the false statements that we allege were found, where they would boast about their progress, they would boast about their customer data, their customer levels, and their growth. They didn't have any profits. So from their perspective and from an analyst's perspective, what was most important was how they were doing in signing up new customers and in trying to get new business, and they were trying to break into a whole area of new business. So it wasn't good enough to have the current type of customers that they had, the sort of, you know, plain vanilla customers that they were getting. They wanted to break into the big time. They wanted to be like the big boys, what they called the incumbent partners, which were the huge data storage companies like EMC and others that were getting the big contracts. They wanted to be like that. And there's nothing wrong with that. But when they were failing to do that, and the reason they were failing to do that was because they rolled out this product just before the class period in November of 2014 called Fiber Channel, and Fiber Channel didn't work. Fiber Channel failed to have the features and failed to have the type of technology that these companies that contracted with the incumbent partners wanted to have, something called an all-flash array and certain other types of features. Fiber Channel wasn't selling. The enterprise companies were refusing to buy Fiber Channel. So when they, what our allegation is that when Fiber Channel, you know, met up with a brick wall, they wanted to try to fill in the gap by basically pumping up the numbers of G5000 customers they have. And we have allegations from multiple CWs that the reason why they were doing these reclassifications was to make the enterprise business appear to be more successful than it really was. But counsel, did any of the CWs actually take issue with the numbers that were reported by the company? They said, Your Honor, that the purpose, and we have about six or seven that said this, or at least, you know, you know, gave that impression in their affirmance in the complaint, that the purpose of this program was to make the enterprise business appear more successful than it actually was. Right. But the court, I thought the district court determined that there was no assertion that any of the actual numbers of the customers were controverted by the CWs. Is that correct? Well, the CWs didn't talk about the public statements, you know, the SEC filings that the company made. I mean, CWs are former employees. They're not usually focused on, they're not analysts, they're not usually focused on the 10-Ks and the 10-Qs that are out in the market. They're focused on what they do inside the company. I mean, and, you know, they focus on the facts relating to their, the scope of their employment. But if the assertion is that the numbers were misleading and none of the confidential witnesses confirmed that the numbers were false, how do you state a claim? So it's not just the numbers, Your Honor. I mean, it's the qualitative statements about the degree of growth, the exponential nature of the growth, 100 percent growth in a quarter, record growth, and so forth, that the analysts relied on. The analysts were very, very surprised at the end of the class period when they said, when they said that they, for the first time, failed to meet their guidance for the third fiscal quarter of 2016. The analysts were stunned. They were very surprised by this news. And the stock dropped by more than 50 percent. And I think, I think there's an error below in suggesting that the, that the CW statement somehow, that there's somehow a gap by not discussing how, you know, the particulars of how, how they were reported to the market. In fact, I think you need to have an inference. But your theory below was, was linked to the global 5,000 customers, wasn't it? Linked to the global 5,000 customers, but also linked to the nature of the growth of the company, which was also linked to the, to the G5,000 customers. The whole point was, this was a G5,000 initiative to which growth was linked. And one of our CWs, CW14, to which was, you know, which was the center of Judge Gonzales-Rogers' opinion, said that the way that Nimble's internal sales force and Cloud9 systems worked, if a commercial account was reclassified as an enterprise account, the account would have been counted as a win during that quarter and announced to the market as such. And that's paragraph 202 in our complaint. And our contention here, Your Honors, is that Judge Gonzales-Rogers, you know, misapprehended that allegation and said that we didn't say sufficiently that it was baked into the numbers that were, that were announced to the public. Did you want to save any time for rebuttal? Yes, I would, thank you. All right. Thank you, counsel. May it please the Court, I'm Felix Lee of Famicom West, on behalf of the defendants. So I'll focus on the G5. We have a big audience here, and I sometimes have trouble keeping up. So could you speak a little more slowly? Sure, sure. So I'll focus, first of all, on the questions regarding the G5,000 numbers and how they related to the alleged misstatements regarding the enterprise segment. Now, the one thing we should focus upon are the things which are uncontested in the record right now. Nimble announced to the market before the, you know, the beginning of the class period that it had 260 G5,000 customers. At the end of the class period, they announced that they had over 400 G5,000 customers, and that is a 50 percent increase. That is undeniably an advancement in their penetration of that segment. And the key things to note with respect to what happened at the lower court was that the plaintiffs conceded in their papers that they could not muster sufficient facts to show that either of those numbers was false. You know, and it bears repeating the exact language that they used. In their opposition, they said that they cannot, quote, directly allege that any given number of G5,000 accounts was false. And then they went on to repeat that on the same page. They said, quote, plaintiff cannot allege sufficient facts to show the actual number of G5,000 customers is false. And then in another place in the same brief that said we cannot tie any specific reclassification to any particular time frame during the class period. Counseling, your view, is that fatal to their complaint? Absolutely. Why? Because if you're going to examine the question of is it false and misleading for Nimble to say that we are broadening our base of customers in the G5,000 space, one of the key metrics that you'd look at is, well, how many customers are there? You know, they themselves plead these numbers in their complaint. And if they're going to tell you that once you quantify the number of customers that they don't have facts to show that those numbers were incorrect, then that is fatal to their case. In fact, that is what the Verifone case tells us, which is whatever optimistic statements a company may make about a particular segment, if you put hard data behind that, you can't be misleading the market because then the market can just look at those numbers and decide for itself. Is going from 260 to over 400, is that, you know, a successful penetration of the market? Well, decide for yourself. And they have admitted that they cannot, they don't have the facts. You know, irrespective of what they might say about reclassifications or Cloud 9, they've admitted we don't have the facts to dispute those numbers. And so that is, in fact, fatal to their claims. So counsel was very careful to say that it was not only a quantitative assertion, but also qualitative, and that the growth statements in addition to the number of G5000 customers was also misleading. What's your response to his reliance on the growth statements? I don't see how you can disentangle quantitative and qualitative statements. If you're going to say something like we've successfully broadened our base in large enterprise companies, if you're going to, if you're going to try and test the veracity of that, how would you do that? You'd say, well, let's look at the number. I'm not sure, in fact, if you just leave these qualitative statements on their own, there would be no way to test that until you actually look at the hard data that supports that assumption. And if they cannot contest the veracity of that hard data, we're done. There needs to be no further inquiry on that front. And the only response that they had, you know, when we pointed out and when the district court pointed out that they've conceded that they can't provide facts to show that these numbers are false, the only response they had was to say, well, just because we didn't plead, we can't plead that it's false doesn't mean that it's true. But that flips the burden of pleading on its head, especially under the Reform Act. The Reform Act does not place a burden on defendants to prove that statements are true. The burden is on them to come up with particularized facts that show that certain statements are false. And that is the thing that, you know, and they failed to do that. And that's the reason why we don't even need to get into the questions of reclassification, though I'm obviously happy to do that. Well, if you say, if they say that they have achieved something that leads the reader to believe that they've achieved a lot more than they know they actually have, is that false or misleading? Well, I'm not sure how that, and this is, again, the Veriform case, I'm not sure how you could create that misperception if you tell them what the numbers are, right? If you say, well, we started with 260, we're ending with over 400, I'm not sure how anyone could be misled, because then the reader can, if you dispute that that is a successful penetration, well, you can decide for yourself. No one can say, well, I didn't know what the true state of penetration of the market was, because we told you what the numbers were. And they can't dispute those numbers. But we're relying on reclassification, are they not? Excuse me? They're relying on reclassification, are they not? Well, yes and no. As an offset to the actual numbers. So one thing to note, it is proper to reclassify a customer if it used to not be in the G5000 and now it is in the G5000, it is proper to reclassify them. So yes, there probably were some customers included in that number that used to not be in the G5000, but are now properly classified there. What the plaintiffs are arguing If I understand Mr. Goldsmith's argument, he's suggesting that it was false and misleading to say, notwithstanding these numbers, that the penetration had occurred without revealing that some of the, some of that alleged growth was really a transfer from one category to another. Yes, that is right. That's their allegation. Now, the question is, are there sufficient particularized facts to show that if that was happening, that these numbers were actually incorrect? And again, their concession is, even that does not lead them to a point where they can say we've got enough facts to show that the numbers were incorrect. And it bears repeating their concession in their brief. Plaintiff cannot tie any specific reclassification to any particular time frame during the class period. That is the opposite of pleading with particularized facts. Particularized facts means we show you the how and the what and the why and the when. They've admitted that they cannot do that. And again, we have to keep in mind, what does reclassification mean? Their witnesses said that reclassification just meant that you were taking certain commercial accounts and you gave them to enterprise account managers. You know, this is on excerpt of record page 132, because enterprise accounts had longer sales cycles. So sometimes they needed, they had bandwidth so they could take on additional, they could take on additional accounts and so they would take it on. That's very different from saying that, well, when we go to the market and we are going to report the number of G5,000 customers, that we're going to take non-G5,000 customers and put them into that bucket. And they don't have a single confidential witness who could actually, who actually was involved in the process of public disclosure. And in fact, opposing counsel admitted during, you know, his argument that none of them had paid any attention or knew anything about Nimble's public disclosures. So how could any confidential witness be in a position to say that when the people in finance were publishing those numbers, that they were including non-G5,000 customers into those figures? They've admitted they don't have any confidential witnesses that say that they want the court to infer it. You know, that is the language that they use throughout their briefing. We want the court to infer that that's what was happening as opposed to witnesses who are providing facts that establish that it happened. So I think we don't have to go any further than that. Like, they have not shown that any of these reclassifications were, were sufficient to establish that the published numbers were incorrect. So that is, those are I think all we need to say with respect to reclassifications. I do want to spend a brief amount of time also with respect to the, the Cloud 9 internal reporting. And in particular with respect to the case law, just because their reply brief actually had some lengthy discussion about the case law with respect to internal reports. And just in interest of time, I'll focus on one case. They placed the most reliance upon the quality systems case to try to support the notion that the Cloud 9 reports that were giving updates about the company's, you know, progress in sales. They've admitted they don't have any confidential witnesses that can tell you what those reports actually said. What they want the court to do is say, well, we should assume that they were predicting a myth because that's what actually happened. You know, that's what the courts, that's what the courts in Congress have deemed fraud by hindsight. You know, assuming that certain things must have been the case just because the company eventually experienced a setback. And they've cited the quality systems saying that, well, that, that's a case that shows that you're allowed to do that. But you could not find a case that is more factually distinguishable than that one. In the quality systems case, the main witness that was relied upon there was not even confidential. It was a member of the, of the company's board of directors. He's actually, he actually not only, not confidential, he came out openly, resigned from the company, and filed a complaint against the company for misconduct. And he said at the time that the company's real-time reports that they were receiving directly contradicted the things that the company was saying to the public at the time. You could not find a case that is more distinguishable. We do not have anybody here who was as willing to say that. Or indeed, we don't have a single confidential witness who's willing to say what those reports indicated at all. And the court in, the lower court pressed opposing counsel very strongly on this point, said, tell us why. Why, why can't they just tell us what the reports indicated? And the lower court pressed  what these reports said if they had access to it, and there was never a response  Sotomayor How does the PSLRA change the way that we analyze this case? Marquis So, this is not notice pleading, and the Ninth Circuit has said what it does is it heightens significantly the pleading burden that must, that they must sozusagen Marquis ...meet in their complaint. Sotomayor The broad has never been notice pleading, you 're saying? Marquis Correct. But it says that with respect to it must be pleaded with factual particularities. So, again, you've got to show the who, and the what, and the where, and the why. And specifically, the legislative intent behind the Reform Act, and the Silicon Graphics case talks about this, said we're trying to snuff out what we call fraud by hindsight. I'm saying that, well, because a company suffered a setback, we're just going to assume that they must have known about that, and that everything that they were saying up to that point was false. And that is exactly what we're seeing here, that the brand of pleading that they're trying to engage in is to say, well, and this is particularly true with respect to these Cloud 9 reports and the guidance in Q3 of 2016. They're saying, we don't know what those reports said, but we'd like you to assume that they were predicting a miss, because that's eventually what happened. And that's exactly what Congress put the Reform Act in place to eradicate. You are not allowed to plead inferences in that manner. And so, you will see, replete throughout the opposing counsel's filings is this request to please infer for us the facts that we need in order to plead a claim, and that is not what you're allowed to do under the Reform Act. But even under the PLSRA, if you plead that the numbers of customers were exaggerated by a material number, and therefore misled the reader to think that this was a more successful company than it was, you don't have to plead, you have to plead exactly how many numbers, because I don't, the exact number of the exaggeration before you have any discovery and can take a look at what the actual facts are, I don't, it seems to be too high a burden. I don't think that you would need to say what the exact number was. But one, you would have to make that threshold allegation that the numbers were false. They have not done that here. But secondly, even if you did do that, you must then say, okay, well, I may not know what the actual number is, but here are the particularized facts that I have to show that I know that that number is wrong. Whatever the correct number may be, I can come forward and tell you that here are the reasons why it's incorrect. You know, they've conceded they don't have the facts to show that. They want the court to infer that those numbers must have been wrong, even though they themselves don't have the courage of their convictions, to plead that in their complaint. And so those are the reasons why I think the court was clearly correct and this decision should be affirmed. All right. Thank you, counsel. Thank you. Rebuttal. All right. Thank you, Your Honors. Let's talk about courage of convictions for a second. So Mr. Lee says that the Quality Systems case, which is a recent Ninth Circuit case, is a case that could not be more factually distinguishable from this case. So in our opening brief, we cited Quality Systems many times. All right. In Mr. Lee's answering brief, he cited Quality Systems zero times. One would have to wonder why that is. I think that's an important thing to note. I would suggest to Your Honors that Quality Systems, while not factually identical to this case, there are no two cases that rely heavily on confidential witnesses that would be. I think Quality Systems is very similar to this case in the ways that count with regard to the nature of reporting, the nature of the degree of detail that has to be in the reporting, the nature of the degree of detail that comes from confidential witnesses. And most importantly, Your Honors, what Quality Systems stands for is the fact that you can take disparate averments from confidential witnesses who come from different parts of the company, and you can put them together and take them as a whole and read them together in order to decide whether the complaint is adequate. What happens in confidential ---- Kennedy, what about his argument about the fact that these statements were clearly contradictory? I'm sorry? As I heard Mr. Lee, he said the statements were clearly contradictory. Well, I don't think any of our statements are contradictory, but you have all of them. What you often find, Your Honors, is you have one witness who works ---- He was distinguishing ---- I think I understood him correctly. Okay. He was saying that the Quality Systems case is distinguishable because there the statements being relied upon were contradictory to each other. I see. I see. Well ---- I think that's what he said. Did I mishear him? He's saying that the statements there showed that the statements by the executives were false. I mean, I think that ---- Contradictory. I see. Well, our statements, you know, show, we think, equally, that the statements that were made by the company regarding the growth of the company were false. I mean, I ---- I mean, one of the things that Mr. Lee doesn't mention is we've got 45 specific names of Nimble's customers. They come from the seven customers I mentioned in my opening argument and from the Southern California Enterprise e-mail, which is discussed in detail in our complaint, which has another set of more than 38 customers, with none of which, not one, appears in the G-5000 database or in Nimble's similar internal G-5000 sales incentive list at any time during the class period. But, counsel, what's your response to opposing counsel's observation that in the papers your client conceded that it could not challenge the numbers? Well, here's the thing about that, Your Honor. I mean, number one, we were trying to ---- Is that true, though? It is and it isn't. And if I can explain why I'm saying that, excuse my, you know, on the one hand, on the other hand. Number one, we were trying to deal with Judge Gonzalez. But those concessions were made in writing. What we were doing there, Your Honor ---- But the concessions were made in writing, correct? Yes. What we were doing there, Your Honor, was we were trying to deal with Judge Gonzalez Rogers' demands for repleting the complaint, which we were having a difficult time dealing with. Now, the reason why the 400 number was not specifically alleged to be false, that's at the end of the class period, is because that number was given, was issued by the company on the last day of the class period, at the same time as a flurry of corrective disclosures. And we decided that that number was not likely to lead to damages because that was on the same day as a whole bunch of corrective disclosures. So we had made a judgment in our pleading that calling that number false wouldn't be helpful in terms of damages. But if you can't attest to the falsity of any of the numbers that were reported by the company, how can you meet the pleading standard? But here's the thing. The theory of the increase from 260 to 400 in a year is entirely consistent with our theory of how they all of a sudden stopped disclosing the number of G5000 customers specifically. They started saying, oh, we have this many G5000 customers. Then all of a sudden, they go quiet and stop talking about that number while they're shifting around the classifications because they don't want to give specific numbers. But none of the specific numbers that were provided were asserted to be false. There was only one number that was asserted, Your Honor, and it was asserted to be false. The added, where they say we added 41 new G5000 customers during the class period, and we did assert that number to be false. So it's not correct that we asserted that none of the numbers were to be false. And there's another problem which had to do with the global 500 as opposed to the global 5,000. And this was something that got muddled in the proceedings below. And the one of the things, one of the numbers that the company did talk about and did give specific numbers for was the global 500. Now, it stands to reason, just by logic, that that would be the largest 500 companies, except there's no such thing as the global 500. It's not a subset of the global 5,000. It's something that the company made up for its own use. All right.  Thank you, Your Honor. Thank you to both counsel for your argument. The case just argued is submitted for decision by the court. The next case on calendar is Flint v. Quint.
judges: Schroeder, O'scannlain, Rawlinson